**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., FTX TRADING LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-_____(JTD) |
| FTX DIGITAL MARKETS LTD., BRIAN C. SIMMS, KEVIN G. CAMBRIDGE, and PETER GREAVES, and J. DOES 1–20 | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff-Debtors Alameda Research LLC ("<u>Alameda Research</u>"), Alameda Research Ltd., FTX Trading Limited ("<u>FTX Trading</u>"), West Realm Shires, Inc., West Realm Shires Services, Inc. (a/k/a, FTX US and "<u>FTX US</u>"; collectively, "<u>Plaintiffs</u>" or "<u>Debtors</u>"), which have each filed a bankruptcy petition in the above-captioned bankruptcy cases, bring this complaint (the "<u>Complaint</u>") against FTX Digital Markets Ltd. ("<u>FTX DM</u>"), Brian C. Simms,

---

[1]    The last four digits of Alameda Research LLC's tax identification number is 4063. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Kevin G. Cambridge, and Peter Greaves, in their capacity as the joint provisional liquidators of FTX DM (collectively, the "Joint Provisional Liquidators" or "JPLs"), and certain currently unidentified individuals or entities identified for the time being as J. Does 1–20 who have either directed and/or aided and abetted the actions of FTX DM or others in the formation of FTX DM, (the "Does"; together with FTX DM and the JPLs, the "Defendants") and allege the following based upon personal knowledge as to themselves and their acts based upon their investigation to date, and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.      This adversary proceeding (the "Adversary Proceeding") is, among other things, about venue.  It is brought by Plaintiffs pursuant to sections 541, 544, 548, 550, and 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), the Declaratory Judgment Act, 28 U.S.C. § 2201, and sections 1304 and 1305 of Delaware Code title 6, in response to serial threats by the JPLs to attempt to relocate these global bankruptcy cases (the "Chapter 11 Cases") to The Bahamas.  Lacking any basis to dismiss these Chapter 11 Cases or transfer venue, the JPLs instead claim that FTX DM—a non-Debtor—is the constructive owner of FTX.com's property (including fiat and cryptocurrency, intellectual property, and customer relationships) as a matter of non-bankruptcy law.  Since FTX DM is the subject of proceedings in The Bahamas, the JPLs insist that the question of ownership be resolved in The Bahamas.  Indeed, they have claimed to the FTX Debtors that it is their fiduciary duty under the laws of The Bahamas to do so.

2.      FTX DM did not succeed to *any* property owned by FTX.com.  Yet the JPL's assertions continue to balloon in size and volume (though never attaining substance), with the JPLs making public statements, statements to third parties outside of The Bahamas, statements to government officials outside of The Bahamas, and filings in this Court—all asserting that FTX

DM is somehow the owner of the entire FTX.com exchange.  More recently, the JPLs have threatened avoidance actions against even direct recipients of preferential payments made by Debtor Alameda Trading Ltd.

3.     Without this Court's prompt intervention, the JPLs—fiduciaries with no constituency but themselves—will continue to assert baseless claims that will harm FTX.com customers and all other creditors of the FTX Debtors.  In this adversary proceeding, the Debtors seek a declaratory judgment that FTX DM has no ownership interest in any of the Debtors' property and that the transactions (and all documents and structures supporting such transactions) that Sam Bankman-Fried and his co-conspirators used in an attempt to hide assets behind the veil of FTX DM are avoidable as fraudulent transfers under sections 544, 548, and 550 of the Bankruptcy Code, and sections 1304 and 1305 of Delaware Code title 6.  If the FTX Debtors succeed in this Adversary Proceeding, there will be no property of FTX DM for local proceedings in The Bahamas to resolve.

4.     The JPLs' claim to ownership of FTX.com's property is based largely on constructive, equitable, and other *non-documentary* arguments that depend upon the false premise that FTX DM was the center of the FTX Group.[2]  Nothing could be further from the truth.  FTX DM was no more than a short-lived provider of limited "match-making" services for customer-to-customer transactions, on the cryptocurrency exchange built, owned, and operated by Debtor FTX Trading, its immediate corporate parent.  Over 90% of customers who used the FTX.com exchange were customers before FTX DM even became operational in May 2022 and, once operational,

---

[2]     As set forth in the Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings (the "Declaration") [Chapter 11 D.I. 24], the Debtors' affairs are comprised broadly of four groups of business, also known as "silos."  [*Id.* at ¶¶ 9–10.]  The Debtors refer collectively to all four silos as the "FTX Group".  [*Id.*]  As used in this Complaint, the term "FTX Group" has only the meaning set forth in the Declaration.

FTX DM never earned a dollar of third-party revenue.  FTX DM was an economic nullity within the FTX Group.

5.    FTX DM was a legal nullity as well.  The peculiar history of FTX DM is a classic example of abuse of the corporate form.  It was created as a front to facilitate a conspiracy to defraud the Debtors' customers—a conspiracy to which three individuals have already pled guilty and for which a fourth, Mr. Bankman-Fried, is under indictment—rendering any and all transactions related to FTX DM avoidable.  FTX DM was part of the mature phase of that conspiracy.  It was formed and functioned as an offshore haven for a continuous fraudulent scheme, as well as a conduit through which the fruits of that fraudulent scheme could be channeled to insiders and third parties outside of the reach of any independent and effective regulatory authority.  Fortunately, Mr. Bankman-Fried and his cohorts were unable to spirit away *all* of the Debtors' property, both practically and as a matter of law, because these Chapter 11 Cases were commenced and Mr. Bankman-Fried and his Bahamian supporters lost the first stage of what Mr. Bankman-Fried described as the "jurisdictional battle vs. Delaware."  [Chapter 11 D.I. 24 ¶ 76.]  Mr. Bankman-Fried can no longer fight that battle now that the U.S. District Court for the Southern District of New York has imposed strict pretrial release conditions upon him.

6.    The JPLs inherited the corporate shell that Mr. Bankman-Fried and his co-conspirators built to harbor their fraudulent enterprise in The Bahamas and now use it to continue the jurisdictional battle.  In doing so, they continue to cast confusion over the true ownership of the Debtors' property and waste the Debtors' assets in the process.  Most recently, the JPLs have insisted on filing in The Bahamas an application that seeks "binding directions and declarations" from a Bahamian court that the FTX Debtors and their global stakeholders do not own core assets—in advance of this Court deciding the same issues.  The FTX Debtors will respond to any

request to lift the stay to proceed with the JPLs' application when filed by the JPLs.  But enough is enough.  The FTX Debtors seek a merits determination from this Court as promptly as the matter can be litigated and resolved.

### JURISDICTION AND VENUE

7.      This Adversary Proceeding relates to Plaintiffs' Chapter 11 Cases filed with this Court on November 11 and 14, 2022 (the "Petition Date").[3]

8.      Plaintiffs bring this Complaint pursuant to Rules 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), sections 541, 544, 548 and 105(a) of the Bankruptcy Code, and sections 1304 and 1305 of Delaware Code title 6.  Declaratory relief is appropriate pursuant to Bankruptcy Rule 7001(9) and the Declaratory Judgment Act, 28 U.S.C. § 2201.

9.      This Adversary Complaint is a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (B), (O) and (P).

10.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

11.      Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409, and venue in this Court is consistent with the interests of justice, judicial economy, and fairness.  Courts typically defer to a plaintiff's choice of forum.  In addition, this Adversary Proceeding asserts claims by Plaintiffs as debtors-in-possession in a chapter 11 proceeding, and therefore should be heard by the Bankruptcy Court overseeing its chapter 11 proceedings.  This Court's extensive

---

[3]      November 11, 2022 is the Petition Date for all of the above-captioned debtors and debtors-in-possession, except for Debtor West Realm Shires Inc., whose Petition Date is November 14, 2022.

familiarity with the facts and background of these Chapter 11 Cases, and with the Chapter 15 proceeding filed by FTX DM in this Court, supports this Court adjudicating this action. Accordingly, Plaintiff submits that this Court is the proper venue for this Adversary Proceeding.

12.     Pursuant to rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), Plaintiff consents to the entry of a final order or judgment by the Court on these claims to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

13.     Plaintiffs in this case are Debtors Alameda Research, Alameda Research Ltd., FTX US, West Realm Shires, Inc., and FTX Trading, all of which are debtors-in-possession in the above-captioned chapter 11 case.  Plaintiffs Alameda Research, West Realm Shires, Inc., and FTX US are incorporated under Delaware law.  Plaintiff Alameda Research Ltd. is incorporated under the law of the British Virgin Islands.  Plaintiff FTX Trading is incorporated under the law of Antigua and Barbuda.

14.     No trustee has been appointed for Plaintiffs in the Chapter 11 Cases and Plaintiffs continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Accordingly, Plaintiffs have the authority to file this Complaint commencing, and thereafter to prosecute, this Adversary Proceeding.

15.     Defendant FTX DM is an international business company incorporated in the Commonwealth of The Bahamas, which operated for a short period of time as a digital assets business under the Digital Assets and Registered Exchanges Act, 2020 (the "DARE Act") as

amended, Statute Laws of The Bahamas.  The principal address and office for FTX Digital is Building 27, Veridian Corporate Centre West Bay Street, Nassau, N.P.

16.    The Defendant JPLs were appointed as joint provisional liquidators pursuant to a Petition for Winding Up Order application by the Securities Commission of The Bahamas and an Order for Appointment of Provisional Liquidator issued on November 10, 2022 by the Commercial Division of the Supreme Court of the Commonwealth of The Bahamas (the "Bahamian Court").

17.    Acting on behalf of FTX DM, the JPLs filed a Chapter 15 Petition for Recognition of a Foreign Proceeding on November 15, 2023.  *In re FTX Digital Markets Ltd.*, No. 22-11217 (Bankr. D. Del) ("Chapter 15") D.I. 1 (the "Chapter 15 Petition") ¶ 47.  This Court granted the Chapter 15 Petition on February 15, 2023, finding that it had jurisdiction over the Petition and the Defendants.

18.    Defendants J. Does 1–20 are certain currently unidentified individuals or entities who have either directed and/or aided and abetted the actions of FTX DM or others in the formation of FTX DM.  Plaintiffs reserve the right to amend this Complaint to specify the identities of J. Does 1–20 as they become identified.

## FACTUAL BACKGROUND

### A.    The FTX Entities Are Founded

19.    Mr. Bankman-Fried and Zixiao "Gary" Wang founded Alameda Research in November 2017.  Mr. Bankman-Fried, Mr. Wang, and Nishad Singh founded FTX Trading (a/k/a FTX.com) in April 2019 and West Realm Shires, Inc. and FTX US in January 2020. Caroline Ellison became co-CEO of Alameda Research in 2021, and the sole CEO of Alameda Research upon the resignation of Samuel Trabucco in August 2022.  Ms. Ellison's employment was terminated in November 2022.

20.    Upon its creation in April 2019, FTX Trading operated an exchange and trading platform which allowed customers to buy, sell, exchange, hold, or otherwise transact in digital assets, use the FTX Application Programming Interface (the "API"), and use any other services through the FTX.com website (the "Site").

21.    FTX DM existed as a corporate entity for just over 16 months.  It was incorporated in the Commonwealth of The Bahamas ("The Bahamas") on July 22, 2021.  Its registration to operate as a Digital Asset Service Provider (but not a Digital Token Exchange) was approved by the Securities Commission of The Bahamas (the "Commission") on September 20, 2021.  FTX DM began operations on May 13, 2022 and operated for just under six months, from May 13, 2022 to November 10, 2022.  As explained below, FTX DM's entire existence fell within the scope of the criminal conspiracy, to which Mr. Bankman-Fried's co-conspirators have already pled guilty.  Indeed, its very formation and existence was in furtherance of that conspiracy.

**B.    The Co-Conspirators Begin to Use the FTX Entities to Perpetrate Fraud**

22.    From at least 2019 and through November 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and Ms. Ellison (the "Co-Conspirators"), variously used Alameda Research, FTX Trading, and FTX DM to engage in a colossal criminal conspiracy.  The aim of much of this improper activity was to use funds from various other FTX entities to prop up Alameda Research, which sustained billions of dollars in trading losses under Ms. Ellison's and Mr. Bankman-Fried's direction.

- As he admitted by guilty plea, from at least in or about 2019 and through November 2022, Mr. Wang conspired to and actually did defraud the customers of FTX Trading by misappropriating customers' deposits and lending customers' deposits to Alameda Research, conspired to commit commodities fraud by implementing changes to the code of FTX.com to permit Alameda Research to incur a negative balance on FTX.com, and conspired to commit securities fraud by lying to investors regarding FTX Trading's financial condition.  Information & Waiver of Indictment, *United*

*States* v. *Wang*, No. 22-cr-00673 (LAK) (S.D.N.Y. Dec. 19, 2022), ECF Nos. 6–7.

- As he admitted by guilty plea, from at least in or about 2019 and through November 2022, Mr. Singh conspired to and actually did defraud the customers of FTX Trading by misappropriating customers' deposits and lending customers' deposits to Alameda Research, conspired to commit commodities fraud by misappropriating their FTX Trading's customers' deposits, conspired to commit securities fraud by lying to investors about FTX Trading's financial condition and the relationship between FTX Trading and Alameda Research, conspired to commit money laundering, and conspired to make unlawful political contributions and to defraud the Federal Election Commission (the "FEC"). Superseding Information & Waiver of Indictment, *United States* v. *Singh*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 28, 2023), ECF Nos. 90–91.

- As she admitted by guilty plea, from at least in or about 2019 and through November 2022, Ms. Ellison conspired to and actually did defraud the customers of FTX Trading by misappropriating customers' deposits and lending customers' deposits to Alameda Research, conspired to and actually did defraud lenders regarding Alameda Research's financial condition, conspired to commit commodities fraud by misappropriating customers' deposits, conspired to commit securities fraud by lying to investors regarding FTX Trading's financial condition, and conspired to commit money laundering. Information & Waiver of Indictment, *United States* v. *Ellison*, No. 22-cr-00673 (LAK) (S.D.N.Y. Dec. 19, 2022), ECF Nos. 8–9.

- As alleged in a pending superseding indictment, for the period beginning at least in or about 2019 and running through November 2022, Mr. Bankman-Fried conspired to and actually did commit wire fraud, conspired to and actually did defraud FTX Trading customers, conspired to and actually did commit securities fraud on FTX Trading investors, conspired to and actually did commit fraud on Alameda Research's lenders, conspired to and actually did commit bank fraud, conspired to operate an unlicensed money transmitting business, conspired to commit money laundering, and conspired to make unlawful political contributions and to defraud the FEC. Superseding Indictment, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

23.     In addition to committing fraud to directly sustain Alameda Research, Mr. Bankman-Fried (and/or others acting at his direction) used FTX DM as the centerpiece of a fraudulent scheme ancillary to the first, this one to funnel FTX Trading customer deposits and

other valuable property and rights to The Bahamas, out of the reach of American regulators and courts.

24.     Mr. Bankman-Fried, and others at his direction, maintained a close, accommodating relationship with Bahamian law enforcement agencies, including, among others, the Commission, and with the Attorney General and Prime Minister of The Bahamas.  Indeed, Mr. Bankman-Fried aimed to leverage that relationship to minimize his criminal and civil exposure should the massive fraud be discovered.

25.     To accomplish the fraudulent scheme, Mr. Bankman-Fried (and/or others acting at his direction) planned to transfer property and rights from FTX Trading to FTX DM, ostensibly regulated by The Bahamas.  At no time were the Co-Conspirators authorized to do so by the law of any jurisdiction or the corporate charters of either FTX Trading or FTX DM.

26.     For example, after founding FTX DM, Mr. Bankman-Fried (and/or others acting at his direction) transferred approximately $143 million of fiat currency belonging to FTX Trading and Alameda into accounts in FTX DM's name at Farmington State Bank (d/b/a Moonstone Bank, "Moonstone") and Silvergate Bank ("Silvergate").  Mr. Bankman-Fried and those acting on his behalf obtained no reasonably equivalent value for FTX Trading or Alameda in exchange for these transfers.  And the transfer of such a significant sum to a shell entity was not within the ordinary course of business for FTX Trading or Alameda.  The true purpose of the transfers were to defraud creditors of FTX or Alameda and to benefit insiders, including the Co-Conspirators themselves.

27.     In additional furtherance of the scheme, in May 2022, Mr. Bankman-Fried (and/or others acting at his direction) secretly introduced new terms of service (*see infra*, ¶¶ 38–42), without altering the front page of the document that FTX Trading's customers reviewed on a

click-through basis (if at all) or otherwise distinguishing the new terms from the old.  Those new terms of service altered the annexed schedules to allegedly give FTX DM a role as a "service provider" in the day-to-day operations of FTX Trading.  But at no point in this scheme did FTX DM ever provide services for FTX Trading commensurate with the magnitude of the Co-Conspirators' transfers on its behalf.

28.     When FTX DM was created, and at all times since, Mr. Bankman-Fried (and/or others acting at his direction) knew or should have known that Alameda and FTX Trading were not solvent and, nevertheless, made the transfers with the intent to avoid U.S. regulators and to remove assets from the reach of their creditors in the event of inevitable bankruptcy proceedings.

29.     The Co-Conspirators were unable to implement their ancillary fraudulent scheme before the Debtors and FTX DM entered bankruptcy and liquidation, respectively.

### C.     The FTX Entities Enter Bankruptcy

30.     On November 10, 2022, the Commission filed a petition for provisional liquidation of FTX DM with the Supreme Court of The Bahamas.  The Bahamian Court granted the petition and appointed Brian Simms as the provisional liquidator.  On November 14, 2022, the Bahamian Court entered an order appointing Kevin G. Cambridge and Peter Greaves as additional liquidators.  Collectively, Simms, Cambridge, and Greaves are the JPLs.

### D.     FTX DM and the JPLs Begin Wrongfully Claiming the Debtors' Property

31.     From the moment of their appointment, the JPLs have repeatedly claimed their ownership of the Debtors' property and have attempted to relocate these proceedings to The Bahamas.  Indeed, on November 15, 2022, the JPLs filed the Chapter 15 Petition that incorrectly averred, among other things, that FTX Digital's "creditors include all account holders with assets stored in the exchange's custodial wallets."  Chapter 15 Petition at ¶ 47.  Moreover, in his

declaration in support of the Chapter 15 Petition, Brian Simms averred that "the FTX network of companies that established the FTX Brand (the "<u>FTX Brand</u>"), . . . were managed and operated by FTX Digital [Markets] in The Bahamas . . . ," and that "[d]espite the seemingly complex structure of the FTX Brand companies, the entire FTX Brand was ultimately operated from a single location: The Bahamas."  [D.I. 2 at ¶¶ 33, 37.]

32.    Since then, the JPLs have continued to assert those same baseless claims to the Debtors' property in the following filings and their accompanying declarations:

- An emergency motion for provisional relief filed on November 16, 2022. [Chapter 15 D.I. 7.]

- A *second* emergency motion for provisional relief, sought before obtaining a ruling on the first, filed on December 9, 2022.  [Chapter 15 D.I. 27.]

- A motion to dismiss the chapter 11 case of FTX Property Holdings, filed on December 12, 2022.  [Chapter 11 D.I. 213.]

- A *third* motion for provisional relief filed on December 23, 2022. [Chapter 15 D.I. 55.]

33.    The JPLs then asserted at their chapter 15 recognition hearing that billions of dollars held by the Debtors in the United States were the property of FTX DM.  [Chapter 15 D.I. 103.]

**E.    FTX DM Never Obtained Claims or Interests in the Debtors' Property**

34.    Despite the JPLs' baseless assertions, FTX DM never obtained claims or interests in the Debtors' property.

*i.    FTX DM Had No Interests Under the Original FTX Trading Terms of Service*

35.    The JPLs' central—and mistaken—theory is that the Co-Conspirators' efforts to transfer the property of Debtor FTX Trading to FTX DM, including by introducing new terms of service, in fact effectuated a transfer of that property.  That theory is fatally flawed; neither

the new terms nor any other action in fact effectuated a transfer of FTX Trading property to FTX DM.

36.     The relationship between customers and FTX Trading was governed by the 2019 and 2020 Terms of Service (the "Original Terms of Service"), and later by the Terms of Service dated May 13, 2022 (the "New Terms of Service").   Under both the Original Terms of Service and the New Terms of Service, the customer relationship was solely between FTX Trading and the customer.

37.     The Original Terms of Service and other records identified by the Debtors during their ongoing investigation demonstrate that:

- FTX Trading owns, and for all relevant periods has owned, the API.

- FTX Trading owns, and for all relevant periods has owned, the Site.

- At all times, through and including the present date, all customer accounts for the Site were maintained in the AWS cloud environment, which was managed by FTX Trading.

- At all times, through and including the present date, all fee income generated by customers using the Site (other than those for FTX Japan and Singapore) was paid to FTX Trading.

- No customer that opened an account on the Site prior to May 13, 2022 ever had a relationship with FTX DM, whether contractual, service, or otherwise.

- No customer that opened an account on the Site prior to May 13, 2022 ever effectively transferred or novated any part of its contractual relationship with FTX Trading to FTX DM.

- During calendar year 2021, FTX Trading generated over $1 billion in third-party revenue.

- During the first three quarters of 2022, FTX Trading generated over $700 million in third-party revenue.

ii.   *FTX DM Obtained No Interests Under the New FTX Trading Terms of Service*

38.    During its six-month operational lifespan, FTX DM had a limited mandate and a limited balance sheet, merely providing certain "Specified Services" as a "Service Provider" under the New Terms of Service.  At all times during FTX DM's lifespan, FTX Trading continued to own and operate the exchange and platform.

39.    To that end, the New Terms of Service demonstrate that FTX Trading is and was the *sole* custodian of funds provided by customers and the *sole* issuer and redeemer of e-money (*i.e.*, converted fiat currency deposited by customers) on FTX.com.  Under those terms, FTX DM never obtained any interests in the underlying property.

40.    The New Terms of Service demonstrate the following:

- FTX Trading was the sole owner and operator of the FTX.com exchange.

- FTX Trading is the named counterparty to the New Terms of Service, just as it was for the Original Terms of Service.

- FTX Trading was therefore in privity of contract with every customer.  The New Terms of Service never transferred or novated the Original Terms of Service to FTX DM.

- In fact, FTX DM did not exist, or was not licensed to conduct business, for those customers who signed the Original Terms of Service.

- Under the New Terms of Service, FTX DM is not the named party, but is identified as one of several "Service Providers" that provides "Specified Services."

- Section 1.3 and the Service Schedules of the New Terms of Service explain that the "Specified Services" to be provided by FTX DM all involve providing technology to facilitate certain transactions on the FTX.com platform "*with other users*."  The Specified Services did not include trading as principal or entering into privity of contract with any customer with respect to any trade.

- Section 8.3 of the New Terms of Service expressly contemplates bilateral transactions between *FTX Trading* and each customer with respect to transactions in fiat currency.

- Likewise, Section 8.3.2 of the New Terms of Service provides for a transaction directly between *FTX Trading* and the customer. This transaction is not a Specified Service; indeed, it is not a match-making function at all, but a direct transaction between FTX Trading and the customer.

- The receipt of fiat currency and issuance of e-money is not a Specified Service, necessarily excluding FTX DM from inclusion as a party to that term.

41.     Additionally, the Debtors' review of other records from their ongoing investigation demonstrates the following:

- FTX DM is 100% owned by FTX Trading.

- FTX DM was licensed by the Commission as a Digital Assets Service Provider ("<u>DASP</u>") under section 6(d) of the DARE Act, and not as a Digital Token Exchange ("<u>DTO</u>"), under section 6(a) of the DARE Act.

- As a DASP, FTX DM was not in the business of providing, and not authorized to provide, distinct custodial services.

- $10 million was deposited into an account in FTX DM's name with Fidelity Bank and Trust (Bahamas) Limited ("<u>Fidelity Bahamas</u>"), which sum represented the estimated cost of an orderly wind-down of FTX DM's business over a six-month period.

- The $10 million deposited in FTX DM's name with Fidelity Bahamas was provided by FTX Trading.

- All FTX.com accounts opened after May 13, 2022 that held digital assets or e-money were maintained in the AWS cloud environment of which Alameda Research was the account owner, not FTX DM.

- The AWS cloud environment was and is located outside of the Bahamas.

- FTX DM never generated revenue from third parties or customers.

- All transactional fees earned under the New Terms of Service were paid to FTX Trading.

- FTX DM only generated intercompany or related-party revenue, which was paid to it primarily by FTX Trading, as well as other related parties.

- FTX DM earned approximately $604,000 net income during calendar year 2021 and approximately $5.17 million net income through the first three quarters of 2022.

- In the first three quarters of 2022, FTX DM had total operating expenses of approximately $73 million, including over $40 million labeled "other expenses."  [Chapter 11 D.I. 337 Exs. E, F.]  These "other expenses" include over $15 million for "Hotels and Accommodation" paid primarily to three hotels in The Bahamas:  the Albany ($5.8 million), the Grand Hyatt ($3.6 million), and the Rosewood ($807,000).  [Chapter 11 D.I. 337 ¶ 17.]

42.    Under both the Original and New Terms of Service, *only* FTX Trading was listed on the first page that customers would have viewed—and *only* FTX Trading was the contractual counterparty facing any customers or entering into any transactions with any customer to receive or return cash.  Neither FTX DM nor any other subsidiary exercised ownership or control over any currency on the FTX Trading platform.

43.    Moreover, in early 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and certain others (the "Executive Employees") each signed offers of employment with FTX DM.  Each of the Executive Employees also executed an Invention Assignment Agreement, which was affixed to their offers of employment.  The Invention Assignment Agreement defines "Company" as "FTX Digital Markets Ltd" and "FTX" as "FTX Trading Limited, an entity organized under the laws of Antigua and Barbuda."

44.    The Invention Assignment Agreement provides, in pertinent part:

**Relationship to FTX Trading.** I understand that all Inventions and other work product that I develop are being developed by the Company for FTX. Accordingly, I consent to the assignment of all such works by the Company to FTX, and I understand and acknowledge that ***FTX is the owner of all of the Inventions or other intellectual property created by me in my course of employment***. I further understand that FTX is a third party beneficiary to this Agreement and has the full right to directly enforce any rights of the Company under this Agreement.

(emphasis added).

45.     Indeed, it was standard practice for all offers of employment at FTX DM to append an Invention Assignment Agreement.  When signing any such offers of employment at FTX DM, employees expressly agreed to and acknowledged FTX Trading's ownership of all intellectual property and inventions created while they were employed by FTX DM.

46.     Accordingly, any intellectual property regarding the API or the Site belonged to Debtor FTX Trading Ltd., and never to FTX DM.

47.     The design of the FTX.com trading system, the Original and New Terms of Service, and the Debtors' investigation to date of FTX DM demonstrate that FTX DM was never more than a mere interchangeable sub-custodian or agent for FTX Trading.  It never acquired an interest in any underlying property.

       *iii.   Even If There Were Transfer or Novation, Any and All Transfers of Property Undertaken to FTX DM Are Avoidable*

48.     As alleged in the indictment of Mr. Bankman-Fried, "from at least in or about 2019, up to and including in or about November 2022," FTX Trading and Alameda Research co-founder Sam Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled . . . through a pattern of fraudulent schemes . . . ."  Superseding Indictment ¶ 1, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

49.     In particular, "this multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed" Mr. Bankman-Fried, "through Alameda, to access and steal FTX customer deposits without detection." *Id.* ¶ 4.

50.     As set forth above (*see infra*, ¶¶ 38–42), Mr. Bankman-Fried and his agents devised the New Terms of Service, among other things, in furtherance of this scheme.  In doing so, they intended, at least in part, to facilitate the transfer of FTX Trading property to FTX DM to

hinder, delay, or defraud its creditors. They had no power to do so under their operative corporate charters or under any law.

51. Further, any transfer of FTX Trading property to or through FTX DM by the Co-Conspirators, whether attempted or actually consummated, was fraudulent because it was not made in exchange for *any* value, let alone *reasonably equivalent* value.

52. At all relevant times since 2019, Mr. Bankman-Fried, at a minimum, was well aware that the transfers of FTX Trading property to or through FTX DM were made or attempted while FTX Trading was already insolvent and for the sole purpose of avoiding and/or frustrating independent regulatory oversight and hindering repayment of the FTX Group's creditors.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT THAT FTX DM HAS NO OWNERSHIP INTEREST IN THE DEBTORS' CRYPTOCURRENCY
### (AGAINST ALL DEFENDANTS EXCEPT J. DOES)

53. The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

54. This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

55. At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

56. The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

57.     Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

58.     In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

59.     FTX DM has no ownership interest of any kind in any cryptocurrency owned by or in the custody of Plaintiffs.

60.     Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in any cryptocurrency owned by or in the custody of Plaintiffs.

## COUNT II
## DECLARATORY JUDGMENT THAT FTX DM HAS NO INTEREST IN THE DEBTORS' FIAT CURRENCY (AGAINST ALL DEFENDANTS EXCEPT J. DOES)

61.     The allegations in paragraphs 1 through 522 are adopted as if fully set forth herein.

62.     This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

63.     At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

64.     The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

65.     Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

66.     In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

67.     FTX DM has no ownership interest of any kind in any fiat currency owned by or in the custody of Plaintiffs.

68.     Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in any fiat currency owned by or in the custody of Plaintiffs.

**COUNT III**
**DECLARATORY JUDGMENT THAT FTX DM HAS NO INTEREST**
**IN THE DEBTORS' INTELLECTUAL PROPERTY**
**(AGAINST ALL DEFENDANTS EXCEPT J. DOES)**

69.     The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

70.     This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

71.     At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

72.     The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

73.     Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

74.     In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

75.     FTX DM has no ownership interest of any kind in any intellectual property owned by or in the custody of Plaintiffs.

76.     Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in the intellectual property owned by or in the custody of Plaintiffs.

## COUNT IV
## DECLARATORY JUDGMENT THAT FTX DM HAS NO INTEREST
## IN THE DEBTORS' CUSTOMER INFORMATION
## (AGAINST ALL DEFENDANTS EXCEPT J. DOES)

77.     The allegations in paragraphs 1 through 522 are adopted as if fully set forth herein.

78.     This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

79.     At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

80.     The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

81.     Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

82.     In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

83.     FTX DM has no ownership interest in any customer information owned by or in the custody of Plaintiffs.

84.     Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in any customer information owned by or in the custody of Plaintiffs.

## COUNT V
### IN THE ALTERNATIVE, ANY TRANSFERS TO OR THROUGH FTX DM WERE FRAUDULENT AND AVOIDABLE PURSUANT TO 11 U.S.C. §§ 544, 548(A)(1)(B) AND OTHER APPLICABLE LAW (AGAINST ALL DEFENDANTS)

85.     The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

86.     This alternative claim for relief arises under 28 U.S.C. § 157(b), Bankruptcy Code sections 541, 544, 548(a)(1)(B), and 105(a), Bankruptcy Rules 7001(2) and (9), and sections 1304 and 1305 of Delaware Code title 6.

87.     At all times, Mr. Bankman-Fried (and/or others acting at his direction) were without legal power or authority to transfer or attempt to transfer Plaintiffs' property, including contractual rights, to or through FTX DM.

88.     The Plaintiffs did not receive reasonably equivalent value in exchange for the transfers of Plaintiffs' property to or through FTX DM by Plaintiffs.  Indeed, Plaintiffs did not receive any discernable value or benefit in exchange for the transfers.

89.     At all times, any transfers of Plaintiffs' property to or through FTX DM were made when Plaintiffs were insolvent.  In the alternative, (i) the Plaintiffs became insolvent as a result of the transfers; (ii) Plaintiffs were caused by Mr. Bankman-Fried (and/or others acting at his direction) to engage in a business or a transaction for which they had unreasonably small capital; (iii) Plaintiffs were caused by Mr. Bankman-Fried (and/or others acting at his direction) to incur debts intended or believed to be beyond the Plaintiffs' ability to pay as such debts matured; or (iv) Plaintiffs were caused by the Co-Conspirators to undertake transfers for the benefit of insiders—including the Co-Conspirators themselves—outside of the ordinary course Plaintiffs' businesses.

90.     Specifically, before, on, and after the dates of the transfers, the sum of Plaintiffs' debts exceeded the fair value of its assets, and the fair value of its assets was less than the amount required to pay its liabilities on existing debts as they became due.  Indeed, the Plaintiffs knew, or should have known, that at the time of the transfers they could not reasonably satisfy their liabilities and indebtedness, as they matured or accrued, with either existing assets or with revenue they could reasonably generate as a going concern.

91.     The transfers were made within two years of the Petition Date.

92.     Based upon the foregoing, any transfers of Plaintiffs' property to or through FTX DM by the Co-Conspirators, and by any of the J. Doe Defendants, are avoidable as constructive fraudulent transfers.

### COUNT VI
### IN THE ALTERNATIVE, ANY TRANSFERS TO OR THROUGH FTX DM WERE FRAUDULENT AND AVOIDABLE PURSUANT TO 11 U.S.C. §§ 544, 548(a)(1)(A) AND OTHER APPLICABLE LAW
### (AGAINST ALL DEFENDANTS)

93.     The allegations in paragraphs 1 through 522 and 88 through 90 are adopted as if fully set forth herein.

94.     This alternative claim for relief arises under 28 U.S.C. § 157(b), Bankruptcy Code sections 541, 544, 548(a)(1)(A), and 105(a), Bankruptcy Rules 7001(2) and (9), and sections 1304 and1305 of Delaware Code title 6.

95.     At all times, Mr. Bankman-Fried (and/or others acting at his direction) were without legal power or authority to transfer or attempt to transfer Plaintiffs' property, including contractual rights, to or through FTX DM.

96.     At all times, any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction) were made or attempted with actual

intent to hinder, delay, or defraud Plaintiffs' creditors, as further demonstrated by, *inter alia*, the following indicia of fraud:

      i.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were *not* for reasonably equivalent value in exchange from FTX DM;

      ii.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, occurred while Plaintiffs' liabilities exceeded their assets and they were insolvent;

      iii.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were made to or for the benefit of insiders—including the Co-Conspirators themselves;

      iv.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were done in secret;

      v.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were made outside of the ordinary course of business;

      vi.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were made in order to facilitate and perpetuate fraud.

97.     The transfers were made within two years of the Petition Date.

98.     Accordingly, any transfers of Plaintiffs' property to or through FTX DM by the Co-Conspirators, and by any of the J. Doe Defendants, are avoidable as actual fraudulent transfers.

## COUNT VII
## RECOVERY OF ANY FRAUDULENT AND AVOIDABLE TRANSFERS PURSUANT TO 11 U.S.C. § 550 (AGAINST ALL DEFENDANTS)

99.     The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

100.    Plaintiffs are entitled to avoid any fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1) (collectively, the "Avoidable Transfers").

101.    Defendant FTX DM was the initial transferee of the Avoidable Transfers and one or more of the J. Doe defendants may have been the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

102.    Pursuant to 11 U.S.C.§ 550(a), Plaintiffs are entitled to recover from Defendants the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief against the Defendants:

1.      A declaratory judgment that FTX DM has no ownership interest in the Debtors' cryptocurrency;

2.      A declaratory judgment that FTX DM has no ownership interest in the Debtors' fiat currency;

3.      A declaratory judgment that FTX DM has no ownership interest in the Debtors' intellectual property;

4.      A declaratory judgment that FTX DM has no ownership interest in the Debtors' customer information;

5.      A finding and order that any transfer or transfers of property or contractual rights to FTX DM are avoidable as fraudulent transfers, either actual or constructive; and

6.      An order that Plaintiffs may recover any fraudulent transfers plus interest thereon to the date of payment, as well as the costs of this action.

Dated: March 19, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*